478 So.2d 953 (1985)
Patricia FARLOW, Widow of Kenneth Wolfe, Individually and as Natural Tutrix of Her Minor Children, Leah Amber Wolfe, J.S. Timber Wolfe and Kimberly Dawn Wolfe and Angela Jo Wolfe, Wife of Arnold Tanner
v.
Rhonda RODDY, Widow of Andrew Joseph Touro, Sr., the Estate of Andrew Joseph Touro, Sr., Dwayne C. Alexander, Henry C. Alexander, State Farm Mutual Automobile Insurance Company, the Louisiana Department of Transportation and Development (Office of Highways) and the State of Louisiana.
Nos. 85-CA-302, 85-CA-303.
Court of Appeal of Louisiana, Fifth Circuit.
November 12, 1985.
Rehearing Denied December 17, 1985.
*954 William J. Daly, Metairie, for Henry C. Alexander and Dwayne Alexander, plaintiffs-appellees.
Gerald Thos. Laborde, Gretna, and Gregory W. Roninger, Jefferson, for Patricia Farlow, widow of Kenneth Wolfe, individually and on behalf of her minor children, Leah Amber Wolfe, J.S. Timber Wolfe, and Kimberly Dawn Wolfe, and Angela Jo Wolfe Tanner, plaintiffs-appellees.
Norman Sisson, William Irwin, Sharon F. Lyles, Gregory J. Lannes, Jr., Chalmette, for Louisiana Dept. of Transp. and Development (Office of Highways), defendant-appellant.
Becnel, Landry & Becnel, William B. Birner, Daniel E. Becnel, Jr., Reserve, and Hugh G. Oliver, Westwego, for Rhonda Roddy Touro, widow of Andrew Joseph Touro, Sr., and the Estate of Andrew Joseph Touro, Sr., defendants-appellees.
*955 Before CHEHARDY, BOWES and Charles GRISBAUM, JJ.
CHEHARDY, Judge.
These consolidated cases arise from a head-on collision that occurred on Louisiana Highway 18 in Luling on November 19, 1981. Defendant, the Louisiana Department of Transportation and Development (Office of Highways) (hereinafter referred to as "DOTD") appeals from a judgment of the 24th Judicial District Court finding it liable to the plaintiffs and awarding a total of $2,557,067.40 in damages plus expert's fees in the amount of $3,750 and costs.
Andrew Touro and Kenneth Wolfe, occupants of one vehicle, died as a result of injuries suffered in the accident. Dwayne Alexander, driver of the other vehicle, suffered injuries but survived. The widows and children of Touro and Wolfe brought survival and wrongful death actions against DOTD and other defendants. Dwayne Alexander brought suit for his personal injuries and Henry Alexander, owner of the vehicle driven by Dwayne Alexander, sued for his property damage.
The Touro and Alexander actions were brought in the 29th Judicial District Court for the Parish of St. Charles; the Wolfe suit was brought in the 24th Judicial District Court for the Parish of Jefferson. The St. Charles Parish actions were later transferred to Jefferson Parish and consolidated with the Wolfe case. DOTD filed a reconventional demand against the estate of Andrew Touro Sr., asserting primary and/or comparative negligence on his part. Prior to trial, all defendants except DOTD (and its reconventional demand against the Touro estate) were dismissed from the suits by compromise or for other reasons.
After a four-day non-jury trial in July 1984, on October 10, 1984 the district court rendered judgment in favor of the Wolfe, Touro and Alexander plaintiffs against DOTD, dismissing DOTD's reconventional demand against the Touro estate.
The trial judge assigned lengthy and detailed reasons for judgment in which he summarized the material portions of the testimony and held that the State was strictly liable under LSA-C.C. art. 2317 for any defects on La. Hwy. 18. He found the highway and its adjoining shoulders were defective because they occasioned an unreasonable risk of harm by reason of the sharp degree of the S-curve near which the accident occurred, the slickness of the road surface, inadequate warning signs and the narrowness of the road at the curved section. He concluded that the accident would not have occurred but for the "deplorable condition" of La. Hwy. 18. The judge found further that DOTD had failed to prove by a preponderance of the evidence any of the defenses to strict liability (namely, fault of the victim, fault of a third person or irresistible force).
In addition, the trial judge held DOTD negligent, finding that La. Hwy. 18 was hazardous because the last asphalt concrete overlay was made in 1966, no work had been performed on the road shoulders to bring them level with the road surface and there were no warning signs posted prior to the curve to warn motorists of the shoulder defect. He found the plaintiffs proved constructive knowledge of the defects by DOTD because the difference in levels between the road and its shoulder was "readily observable" and DOTD "obviously" had breached its duty to inspect the highway, "evidenced by the absence of work on the shoulders, ruts, etc." The judge also concluded that DOTD failed to take corrective action within a reasonable time.
On appeal DOTD asserts the trial judge committed manifest error in finding that the accident was caused by a defective highway, in holding that the defect in the highway created strict liability on the part of DOTD and in failing to find Andrew J. Touro Sr. comparatively negligent; that the judge improperly substituted his judgment of highway conditions for those of DOTD's experts; and that the judge abused his discretion in the general damages awards to the plaintiffs.
The following facts are undisputed:
*956 In the early afternoon of November 19, 1981, Andrew J. Touro Sr. was driving his 1980 Dodge Sport pickup truck in an easterly direction on La. Hwy. 18 (also known as River Road) with Kenneth J. Wolfe as a guest passenger. At an S-curve section of the highway upriver from its intersection with La. Highway 3060 (also known as Barton Avenue) in Luling, the pickup truck crossed over into the opposite lane and collided head-on with a 1976 Ford dump truck travelling in a westerly direction. The dump truck, owned by Henry C. Alexander, was being driven by Dwayne Alexander. The collision occurred entirely in the dump truck's lane of travel. There had been a rain shortly before the accident happened.
Wolfe was thrown out of the pickup truck and died at the scene. Touro suffered severe head injuries and injuries to other parts of his body; he was unconscious at the scene of the accident and was taken to a hospital. He expired on December 2, 1981 without recovering consciousness, after his family agreed to removal of life support systems following a medical determination of brain death. Dwayne Alexander was hospitalized briefly and was treated for several months thereafter for soft-tissue injuries to the cervical spine area.
The mandatory speed limit on La. Hwy. 18 as a whole was 45 miles per hour. Dwayne Alexander was travelling 25 miles per hour and was in his travel lane; there is no evidence of fault on his part. The Touro vehicle swerved in and out of Alexander's lane two or more times before colliding with Alexander's truck. Blood alcohol tests performed on the drivers were negative.
The only eyewitnesses were Dwayne Alexander and Joyce Hood. Alexander testified it had been raining earlier but was not raining at the time of the accident; however, the road was wet. He was coming upriver (westbound) from Ama, returning to Hahnville. He had been driving 35 m.p.h., but as he approached Barton Avenue he slowed to about 25 m.p.h. because of the intersection. Right past the intersection he entered a curve. Just before he got to the curve there was a yellow pickup truck zigzagging or "fishtailing" in and out of his lane. The truck came across the center line a few times; when Alexander realized the pickup was going to hit him he turned his wheel to the right but the trucks collided.
Alexander said he never saw the pickup go off the highway, only into his lane. He said the pickup truck was going "pretty fast" but "not the exact speed." Alexander said the speed limit in his lane was 35 m.p.h. Although he travelled this route frequently at that time, he had not noticed the speed limit in the downriver lane near this intersection. He could not recall whether there were any curve indicator signs at the time of the accident. He did recall having seen a "low shoulder" sign but did not recall seeing any low shoulders.
Joyce McDonald Hood was driving in the downriver (eastbound) lane ahead of the Touro vehicle at the time of the accident. She testified she had slowed to 25 or 30 m.p.h., preparing to turn from Hwy. 18 onto Barton Avenue, when she glanced in her rearview mirror and first noticed the pickup truck behind her. The pickup truck was coming up into the second part of the curve and was in its own lane. She looked ahead of her again, then glanced back into her rearview mirror. She saw that the pickup was over toward the right of the road. She did not know if the pickup actually went off the road onto the shoulder. She looked in front of her again, looked back in her mirror, and saw the pickup over on the left side of the road. It looked to her like he was trying to get back in the right-hand lane. She looked ahead of her again and completed her turn.
Hood did not see the exact moment of impact. Because she realized a wreck was about to occur she hurried to complete her turn and get out of the way. She said the pickup truck did not appear to be coming around the curve "too fast"; it did not look to her to be going as fast as 55 m.p.h.
*957 Hood admitted she did not notice on the day of the accident whether there were any speed limit signs. She stated that a couple of days after the accident she was passing that way again and noticed there was no speed limit sign; a week or so later she saw there was a sign, right before the convenience store upriver from the curve.
Hood did not know if there were any curve indicator signs at the time of the accident. She said sometimes there are curve indicator signs and sometimes not. Hood also admitted she did not observe the condition of the shoulder on the day of the accident. However, she stated there are no signs indicating a low shoulder but that the road does have a low shoulder. She said she has not known it to be anything other than that and she has driven the area for 14 years.
She testified there is a recreation center along the highway between Badalementi Street and Barton Avenue, in the area of the curve. It has a shell parking lot with a deep incline between the highway surface and the parking lot. She admitted she has seen S-curve signs between Badalementi and Barton from time to time but was unsure if one was there before this accident.
Under cross-examination she admitted that at her deposition (taken approximately 10 months after the accident) she had been unable to recall whether the road had low shoulders. She said her memory had been refreshed by viewing the photographs offered in evidence at the trial.
State Trooper First Class Johnell Temple investigated the accident. He testified it had just stopped raining about five to ten minutes before he arrived on the scene. He stated that he examined the road for defects within a radius of 300 to 400 feet from the accident, but found none. He examined the road throughout the S-curve area, including the shoulder edge by the driveway of the recreational building. He stated the shoulder was "up to the edge" of the highway in that particular area, including the driveway of the recreational center. He did not measure the difference in elevation between the road surface and the shoulder.
Temple said he was looking for evidence of gouged track marks within the gravel portion of the roadway that would indicate the pickup truck had run off the edge of the roadway, but found none. He stated there was no evidence either vehicle ever left the travel portion of the road within the S-curve area up to the point of impact.
Trooper Temple also testified that following his examination of the scene he drove up and down the roadway to locate the mile marker. In doing so he noticed there were 35 m.p.h. signs posted both east and west of the site. At first he stated there had also been a curve warning sign, but under cross-examination he admitted he was not sure if the curve sign was there. He stated he was "looking specifically for numbers." He said the speed zone in the straightaway on Hwy. 18 is 45 m.p.h. He estimated the speed of the pickup truck at 35 to 40 m.p.h.
He could not determine if either vehicle applied its brakes because there were no skid marks due to the wet road. The road was divided by double yellow no-passing lines. Upon being shown photographs offered in evidence by the plaintiffs (made from a videotape taken six weeks after the accident), he denied seeing the same conditions on the day of the accident. (Those photographs showed an uneven edge to the road and a rut in the shell shoulder of the road adjacent to the asphalt.) He testified that if the road had looked like that he would have noted it because it could have been a factor in the accident.
Under cross-examination Trooper Temple's memory of some details proved faulty: He stated the windshield of the pickup truck was "totally out," but photographs taken at the scene show the windshield fractured yet still in place. He asserted the highway in the area of the accident had been freshly resurfaced during the year preceding the accident; later he admitted he was unsure if the resurfacing operations had gone as far as that point. (The only admissible evidence of resurfacing *958 showed the latest resurfacing had taken place in 1966.) His estimates of the locations of the speed limit signs near the accident site were confused.
He also admitted that in his deposition he had said, "I can tell you some horrifying stories about LA 18," and "This particular curve [can give you] a false sense of security if you don't know the area."
The crux of the liability issue lies in determining what caused the pickup truck to cross over into the opposite lane of traffic. Without the testimony of its occupants we are left to surmise what happened to the pickup truck and its driver before the collision.
The trial judge accepted the plaintiffs' theory that Touro must have lost control of his vehicle due to road conditions. The plaintiffs' experts postulated that the swerving or "fishtailing" of the pickup truck, described by Dwayne Alexander and Joyce Hood, developed because the pickup truck had gone off onto the right shoulder of the road coming around the S-curve and Touro was unable to regain control of it due to the difference in elevation between the shoulder and the road, the slipperiness of the worn highway surface, and excessive speed of the pickup truck due to the absence of adequate warning signs in advance of the curve. The plaintiffs' experts asserted there should have been an S-curve warning sign and an advisory-speed sign of 35 m.p.h. placed in advance of the curve because 45 m.p.h., the mandatory speed, was too fast for the curve.
The evidence as to whether there was an S-curve sign and 35 m.p.h. advisory-speed sign is conflicting. Plaintiffs presented a videotape film of the road made six weeks after the accident, which showed no advisory-speed or warning signs. The videotape also showed an uneven edge to the roadway in the eastbound lane as well as a noticeable difference in elevation between the edge and the shoulder, including ruts in some places adjacent to the roadway edge. Trooper Temple testified there was a 35 m.p.h. speed zone marked. Alexander testified the speed limit was 35 m.p.h. Hood could not recall if there were signs there on the day of the accident.
Plaintiffs presented the testimony of three experts, none of whom had investigated the accident until a few months prior to the trial (some 3½ years after the accident). These experts each opined that a posted speed of 45 m.p.h. was unsafe because ball-bank indicator studies showed lateral deflection greater than 10 degrees on the curves in question and the road was slippery because the asphalt concrete surface was worn. They also noted the presence of ruts along the side of the road in the S-curve sections, which they said indicated vehicles tend to run off the roadway. They attributed this to the relative narrowness of the lanes. (The downriver lane ranged from nine feet eight inches to ten feet at various points along the S-curve.)
A ball-bank indicator is a U-shaped glass tube, containing clear fluid and a ball, calibrated in degrees representing the deflection of the ball. When the device is attached to the dashboard of a car, centrifugal force acts on the ball as the car goes around curves, moving the ball to one side or another of the tube. Ten degrees is the maximum lateral deflection recommended by the American Association of State Highway and Transportation Officials. This standard is set forth in the Association's handbook, A Policy on Geometric Design for Rural Highways, commonly known as "The Bluebook" in traffic engineering circles. Although the Bluebook standards are not mandatory on most state highways they are given deference.
I. Robert Ehrlich, an expert in accident reconstruction and handling vehicles, tire interface and roadway design, estimated the combined speed of the dump truck and the pickup truck was 70 to 80 m.p.h. Thus, if the dump truck was going 25 m.p.h., the pickup truck must have been going 45 to 55 m.p.h. His ball-bank indicator studies showed a deflection of 11-12½ degrees on the curves, 2½ degrees above the AASHTO standard. He concluded that a motorist travelling 45 m.p.h. on these curves would encounter "close to uncomfortable" side acceleration *959 and on a slippery pavement "might have trouble retaining control."
Ehrlich noted that water acts as a film on the road, especially at high speed, and that all roadways contain a residue from petroleum products, tires and dirt that makes them more slippery after a rain. This road in particular he considered unsafe because the asphalt concrete surface was old, so that the asphalt matrix had eroded into the gravel aggregate. As a result, he said, the stones of the aggregate were exposed and had become worn and polished from passing traffic. When these stones are wet they become slick. He asserted this condition could not have been new; he was sure it was the same in 1981, when the accident occurred, as it was in 1984, when he inspected it.
He also noted each lane of the highway was approximately nine feet wide and that most trucks are eight feet wide. He said that causes most drivers to move to the right of their lane to avoid being sideswiped. He determined the parking lot of the recreational center ranged from three to five inches lower than the highway surface.
Ehrlich's theory was that Touro must have lost control of the pickup truck as it was coming around the curve on the wet roadway. Ehrlich concluded the cause of the accident was either insufficient traction on the road or dropping a wheel off the shoulder, or a combination of the two. He stated the curve is a factor because it requires additional traction and the posted speed limit of 45 was too fast to obtain sufficient traction, especially on slippery pavement.
Under cross examination, Ehrlich admitted the pickup could have skidded if Touro threw on his brakes when he saw Mrs. Hood slowing to turn onto Barton Avenue. However, Ehrlich felt the fishtailing action described by Alexander negated frontbrake lockup, although it could indicate rear-brake lockup.
The plaintiffs' second expert, Duaine Evans, an expert in traffic engineering and accident reconstruction, testified in the same vein as Ehrlich. In addition to noting the results of his ball-bank indicator studies and stating the maximum safe speed along the S-curve would be 35 m.p.h., he discussed the ruts and dropoffs he had seen along the road shoulder. He stated that at the time he viewed the site there were inadequate warning signs; he considered the road should have had curve indicator signs, 35 m.p.h. advisory speed signs, "slippery when wet" signs, "road narrows" signs and "low shoulder" signs.
In Evans' opinion the most probable cause of the accident was the narrow lane, which tended to force the vehicle closer to the edge than normal. He concluded the Touro vehicle had gone off the edge of the road, got back on, and went out of control. He did not think excessive speed was a factor at all. His conclusion that Touro went onto the shoulder was based on Hood's testimony that she saw the pickup close to the right edge. In his opinion wetness, road film, inadequate signing and lack of proper shoulders were the basic causes of the accident.
John Nicklaus, an expert in traffic control, traffic maintenance, traffic engineering and civil engineering, also ran ball-bank indicator tests of the road and concluded that 45 m.p.h. was an unsafe speed for the S-curve. Assuming there were ruts of four to five inches along the shoulder at the time of the accident and that the pickup truck left the road, he stated, the difference in elevation would have caused problems in re-entering the roadway, leading to a loss of control. The wet surface would have reduced the coefficient of friction so the vehicle was more likely to move off the roadway.
DOTD's expert was Ned Walton, an expert in accident reconstruction, highway design, highway construction and highway maintenance. Walton did not perform ballbank indicator studies but relied instead upon speed surveys and traffic volume studies of the highway performed by DOTD and calculations of the friction quotient of the road surface. He found that the 45 m.p.h. speed limit of Hwy. 18 was *960 based on studies showing 45 m.p.h. as the 85th-percentile speed. (The 85th-percentile method, an accepted factor in setting speed limits, is premised on findings that 85 percent of traffic will travel at a safe speed.)
Using a survey of the road surface provided by plaintiffs, Walton calculated the friction demand of the pavement surface. Friction demand is the amount of friction required to keep a vehicle on the roadway. The formula, used in the AASHTO Bluebook, calculates the centrifugal acceleration on a curve by taking into account the superelevation of the curve, the friction on the roadway, tire interface, radius of the curve, and speed. He found the friction demand at the first curve at the accident location at a speed of 45 m.p.h. was .11 to .12. At the second curve, it was .16 to .18.
Because the friction demand must be compared with the friction supplied by the roadway, Walton used the AASHTO Bluebook coefficient of friction scale for the type of surface involved. He stated the Bluebook shows the friction reading for a "glazed, bleeding, asphalt-type surface, when wet" is .2 and above.
(The term "bleeding" refers to a pavement with an asphalt content higher than it should be in proportion to the aggregate content. This produces dissolution or bleeding of the asphalt particles onto the pavement surface, resulting in glazing as fine particles of the aggregate come out. A glazed, bleeding, wet surface would be a fairly bad condition, with a low coefficient of friction. Walton said he did not see any indication this roadway was glazed or bleeding, but used numbers for those conditions to allow a margin of error.)
Walton estimated that the pavement involved here could supply as high as .35 friction. He concluded that if the pavement would supply between .20 and .35, and the requirement on the first curve is .11 or .12 and on the second curve is .16, at the assumed 45 m.p.h. the pavement supplied adequate friction for a vehicle to traverse the curves safely. Accordingly, he stated, he did not feel the pavement contributed to the accident.
Walton disagreed with the plaintiffs' experts' interpretation of the ball-bank indicator studies. He stated that the ball-bank readings refer to degree of comfort in traversing a curve rather than the degree of safety. He said if a driver feels comfortable then he is driving at a safe speed; however, just because a driver feels uncomfortable does not mean he is driving at an unsafe speed.
Walton also pointed out that the ballbank indicator is calibrated in five-degree gradations. He stated that a variation of one or two degrees is insignificant. He opined that the ball-bank readings were immaterial to the safety factor in this situation. He stated that the coefficient of friction demand requirement is the crucial factor.
Walton also discussed the plaintiffs' shoulder-edge elevation theory. He inspected the road edges, including plaintiffs' photographs from the videotape, and determined the edges were graded or sloped sufficiently to allow a vehicle going off the edge to regain the road surface smoothly even at 45 m.p.h. in wet weather. He discussed studies of vehicles performing edge-shoulder dropoffs that supported his conclusions, although he admitted the studies used primarily professional drivers on straight dry-surface roads. Assuming the ruts present in the videotape were present at the time of the accident, he maintained that the edge condition would not cause a loss of control; if it did, he stated, vehicles would go off the road to the right rather than to left into the opposite lane. He concluded that the banking and superelevation of the curves were adequate to supply sufficient friction at 45 m.p.h.
Regarding causation, the trial judge stated in his reasons for judgment,
"Overall, this Court finds that the expert opinions and supporting factual evidence offered by the plaintiffs was far more credible than that offered by the defendant. The plaintiffs submitted a multi-based theory, well supported by *961 their evidence. The defendant offered no real postulate as to why this accident happened other than to propose that Touro lost control of his vehicle. Why he lost control is the essential issue in this case. The plaintiffs dominated in their reasonable answers offered as to that issue."
Responding to the trial judge's listing of items he considered defects in the roadway, DOTD argues that under the law within this circuit, the state does not have a duty to upgrade highways to current standards and therefore the fact that Hwy. 18 is narrower than modern roads should not be considered a defect.
We agree, and have held in other cases, that failure of the state to update its highways to current standards does not in itself establish the existence of a hazardous defect. See Devall v. Morgan, 424 So.2d 522 (La.App. 5 Cir.1982), writ denied 427 So.2d 1214. In the Devall case, however, we found that the narrowness of the road was not proven to be the cause of the accident. Here, the trial judge found the narrowness of the road was a defect when combined with the slickness of the surface, the sharpness of the curve, lack of warning signs and the posted 45-m.p.h. speed limit. To reverse his conclusion we would have to find he was clearly wrong.
DOTD also argues the trial judge erred in finding the road surface was too worn and slick. DOTD cites the testimony of plaintiffs' expert Ehrlich, who referred to "skid numbers" used in his home state of New Jersey to establish skid characteristics of a road. Ehrlich stated that skid characteristics of a road were classified as 40, "Keep close watch"; 35, "Resurface"; and 30, "Emergency." He rated the surface of La. Hwy. 18 as a 38. Because this number was not low enough to be within the "Resurface" range, DOTD argues the state could not be considered negligent in failing to resurface it.
Similarly, DOTD urges that the ball-bank readings taken by plaintiffs' experts did not establish that the curve was unsafe. Defendant cites the statement of DOTD's expert, Walton, that ball-bank readings indicate comfort rather than safety. The judge concluded the plaintiffs' experts' assessment of the value of ball-bank studies was more convincing than the assessment of defendant's expert.
In addition DOTD cites the testimony of Trooper Temple as to the presence of 35-m.p.h. advisory speed signs, absence of defects in the road shoulder and lack of any sign the Touro vehicle had gone off onto the shoulder. Even considering that Temple inspected the scene of the accident immediately after it occurred, and that he had some training in accident investigation, unquestionably he was not an expert in accident investigation or accident reconstruction. He knew there were certain factors to look for but he did not observe details to the extent required to make the conclusions made by the plaintiffs' expert accident-reconstructionists. Further, some 3½ years had passed since the accident. Under cross-examination, Temple's memory of certain particulars proved understandably faulty. (For example, although he was "sure" there were 35 m.p.h. speed limit signs posted before the curves, he could not recall what color they were or exactly where they were.)
It is the province of the trier of fact to decide how much weight to grant conflicting testimony, whether factual or expert. The trial judge's assessment of the value of this testimony was certainly within his discretion.
Although neither the road width, the slickness of the surface, the posted speed limit, nor the degree of the curve would individually be likely to produce accidents, in conjunction they produced a situation in which accidents were more likely to occur. The judge stated, "[T]his Court is of the opinion that the above defects collectively posed an extremely unreasonable risk of harm to motorists." Bearing in mind the great deference we are required to give the findings of the trier of fact, we find no manifest error in that conclusion.
*962 Canter v. Koehring Company, 283 So.2d 716 (La.1973).
Similarly, DOTD argues that the testimony of witness Joyce Hood was impeached. In her deposition she had stated there were no defects or ruts in the road shoulder; at trial, after viewing photographs made from the videotape, she stated the road shoulder looked exactly as shown in the photographs. She stated the photographs had refreshed her memory.
We do not find the judge's assignment of credibility erroneous. The words "defects" and "ruts" would not necessarily carry the same implication to a layperson as they would to an expert. Further, it is reasonable that viewing photographs taken shortly after the accident would refresh her memory as to conditions. The trial judge obviously did not feel she was lying. We do not consider that her deposition testimony impeachably contradicted her trial testimony.
DOTD challenges the trial judge's conclusion that it is liable under LSA-C.C. art. 2317, asserting primarily that the plaintiffs failed to prove that any of the alleged defects in the roadway played a part in the accident. Indeed, the cause of the accident was not definitively established. Plaintiffs' burden of proof, however, was simply to show it was more probable than not that the accident occurred in the manner they postulated. The trial judge found they carried their burden of proof by a preponderance of the evidence. We do not find him to be clearly wrong in that conclusion.
In view of our affirmance on the basis of strict liability we find it unnecessary to discuss the trial court's additional conclusion that DOTD was negligent.
The damages awarded were as follows:

KENNETH WOLFE
 Loss of past and future
 earnings and benefits of
 Kenneth Wolfe....................$ 554,840.00
 Funeral expenses................... 609.00
 Pain and suffering of Kenneth
 Wolfe............................ 25,000.00
 Loss of love, affection and
 consortium by Wolfe
 plaintiffs....................... 525,000.00
 _____________
TOTAL...............................$1,105,449.00
ANDREW TOURO SR.
 Loss of past and future
 earnings and benefits of
 Andrew J. Touro Sr...............$ 894,372.00
 Medical expenses of Andrew J.
 Touro Sr......................... 23,506.33
 Funeral expenses of Andrew J.
 Touro Sr......................... 2,179.57
 Pain and suffering of Andrew
 J. Touro Sr...................... 100,000.00
 Loss of love, affection and
 consortium by Touro
 plaintiffs....................... 400,000.00
 _____________
 TOTAL..............................$1,420,057.90
HENRY C. ALEXANDER
 Property damage....................$ 12,608.50
DWAYNE ALEXANDER
 Medical costs and pain and
 suffering........................$ 18,952.20

In addition, Traveler Insurance Company, intervenor, received reimbursement for sums paid as worker's compensation benefits. Further, DOTD was ordered to pay expert fees in the amount of $3,750.
DOTD has not appealed as to the items of special damages. (The amounts awarded for loss of earnings were those computed by DOTD's own expert.) The amounts appealed by the defendant are the awards for pain and suffering of the decedents and for loss of love, affection and consortium by their survivors, as well as the amount for pain and suffering to Dwayne Alexander.
The parties stipulated that Dwayne Alexander's medical expenses were $3,952.20. Subtracted from the $18,952.20 awarded him, that leaves $15,000 in general damages. Dwayne Alexander suffered a soft tissue injury to the neck and back, diagnosed as acute cervical sprain. He underwent several months of treatment; his physician has assigned him a ten-percent permanent disability, classifying him as a chronic soft tissue injury. Dwayne Alexander and his witnesses testified that in addition to the physical pain he suffered and still suffers, he has become depressed, withdrawn and moody since the accident, mentally reliving the horror.
DOTD argues that $15,000 is excessive for this injury and that Alexander should not be awarded damages for any mental *963 suffering. Regarding the latter, the trial judge specifically acknowledged that there is no cause of action in Louisiana for mental anguish due to witnessing the suffering of others, stating, "There is no doubt in this Court's mind that Dwayne Alexander received personal injuries as a result of the negligence and/or strict liability of DOTD." He felt that Alexander's physical pain alone was worth $15,000.
As DOTD states in its brief, awards for the type of injury suffered by Alexander range from $10,000 to $20,000. The $15,000 awarded here is midway between the high and the low. Before this court can disturb a quantum award by a trial court, the record must clearly reveal that the trier of fact has abused its discretion. If so, then we are limited to lowering (or raising) the award to the highest (or lowest) point reasonably within the discretion afforded the trier of fact. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). We find no abuse of discretion in the award to Dwayne Alexander.
DOTD challenges the award of $25,000 to the Wolfe plaintiffs for pain and suffering of Kenneth Wolfe prior to his death. (That award was apportioned $5,000 to each of the five family members.) DOTD argues that Wolfe was unconscious "upon impact" and died "almost instantly," and therefore that "his pain and suffering could only have been instanteous."
These statements are contradicted by the testimony of Joyce Hood, who stated that Wolfe was lying in the road, not moving, but he was breathing, "like sighs." She said there was blood pumping from his ears in rhythm with his breathing. Although the evidence does not establish that Wolfe was conscious at the time Hood observed him, the location of Wolfe's body following the accident in relation to the location of the pickup truck establish he was thrown out of the truck and very likely was run over by the dump truck.
No matter how quickly unconsciousness followed, he must have suffered great pain and terror, however briefly, in contemplation of his imminent and horrible death. The trial judge stated, "[T]estimony at trial convinced this Court that Kenneth probably suffered substantial pain immediately prior to his death. Even if he died within 3-5 minutes of the accident, the conscious awareness of the imminence of his death would, in this Court's opinion, support a total award of $25,000." We cannot say the record clearly establishes an abuse of discretion in this award.
The court awarded $525,000 to the Wolfe plaintiffs for loss of love, affection and consortium. The trial judge apportioned it $200,000 to Mrs. Wolfe; $100,000 each for the two minor children in her care; $75,000 to the unmarried major daughter; $50,000 to the married major daughter. Compared to awards made by Louisiana state courts in other cases, this is a very high award for that single item of damages.
Our task in reviewing the award, however, is not whether a different award would have been more appropriate, but whether the trial court's award can reasonably be supported by the record. Carter v. Board of Sup'rs of Louisiana State University, 459 So.2d 1263 (La.App. 1 Cir. 1984).
In his reasons for judgment the trial judge stated,
"[N]umerous witnesses on behalf of the Wolfe family testified as to the close-knit and harmonious family atmosphere which was always present in the Wolfe home. Evidence also showed Patricia Wolfe's emotional and financial dependence on Kenneth prior to his death. Mrs. Wolfe was, this Court observed, visibly shaken about her loss. Mrs. Wolfe stated that after Kenneth's death, she resorted to pills and alcohol in an effort to lessen the pain. The children testified to the severe loss they experienced after the death of their father. This Court recognizes that no amount of money will bring back Kenneth Wolfe but is of the opinion that a total award for the loss of love, affection, companionship, consortium and parenting in the amount of $525,000 may help to assuage the pain felt by the Wolfe family. * * *"
Recognizing the great discretion of the trier of fact, we cannot say that his interpretation *964 of the evidence was unreasonable. Accordingly, we do not find a clear abuse of discretion in this award.
The trial court awarded the Touro plaintiffs $100,000 for Touro's pain and suffering (apportioned one-third each to Mrs. Touro and the two minor children) and $400,000 for loss of love, affection and consortium (apportioned $200,000 to Mrs. Touro and $100,000 to each of the children). The court observed,
"[T]his Court was impressed with the testimony of Dr. Francis Alessi, * * * who treated Andrew Touro until his death on December 2, 1981. Dr. Alessi stated that upon his initial examination of Andrew Touro, the patient was comatose, in a severe state of cerebral trauma, and in critical condition. Dr. Alessi was of the opinion that Andrew Touro probably sustained brain death within the first ten to twelve hours of the accident, but that he could have experienced pain until his final death. Because Andrew Touro was not pronounced legally dead until December 2, 1981, this Court cannot assume that he felt no pain from the time he experienced brain death until the time of his actual death. Thus, this Court is of the opinion that a total award for the pain and suffering endured by Andrew Touro should be $100,000 * * *.
"With respect to the wrongful death claim for the damages sustained by the Touro plaintiffs, Rhonda Roddy Touro testified that she alone made the decision to terminate all life support systems on behalf of her husband. This Court sympathizes with the responsibility which was thrust upon Mrs. Touro, and recognizes, through her testimony, the pain which she must have suffered as a result of the ultimate death of her husband. Although Mrs. Touro's two children did not testify (they are of pre-school and early school age), Mrs. Touro's testimony concerning the familial relationship which existed between Andrew and his son and daughter convinces this Court that the children are aware of and feel the loss of their father. Thus, this Court finds that a total award of $400,000 for the loss of love, affection, companionship, consortium and parenting is a fair and reasonable amount * * *."
Considering the above findings by the trial court and that our own review of the record discloses both a rational basis for his findings and no manifest error in his conclusions, we find no clear abuse of discretion in the awards to the Touro plaintiffs.
For the foregoing reasons, the judgment of the district court is affirmed. All costs are assessed against appellant.
AFFIRMED.