493 So.2d 592 (1986)
Patricia FARLOW, et al.
v.
Rhonda RODDY, et al.
No. 86-C-0112.
Supreme Court of Louisiana.
September 8, 1986.
Rehearing Denied October 9, 1986.
*593 Norman Sisson, Doran & Kivett, William Irwin, Jr., Sharon Lyles, Gregory Lannes, Jr., Norman L. Sisson, Baton Rouge, for applicant.
Gregory Roniger, Dalton, Gillen & Roniger, Jefferson, Gerald LaBorde, Becnel, Landry & Becnel, William Birner, Hugh Oliver, William Daly, La Place, for respondent.
DENNIS, Justice.
We granted certiorari to consider the single question raised by relator: whether the trial court's finding that highway defects caused the vehicular homicides and injuries arising from a head-on collision was clearly or manifestly erroneous because the trial court based its determination on the experts' conjectures and assumptions in disregard of the eyewitnesses' testimony. The court of appeal, 478 So.2d 953, affirmed the trial court judgment against the DOTD awarding plaintiffs damages for wrongful deaths, survival actions, personal injuries and property damages. We affirm. The trial court did not base its findings exclusively on experts' opinions but on all of the evidence, including eyewitness testimony and circumstantial evidence, as well as expert opinions. The experts' opinions were not conjectures or assumptions but reasonable inferences based partly on firsthand observations and partly on facts in the record at the time the opinions were stated. The trial and appeals courts did not disregard the testimony of any witness but exhaustively reviewed all of the evidence.
It is unnecessary for this court to describe in detail the testimony of each witness. This job was done thoroughly and well in two lengthy opinions by the trial and appeals courts. Hence, we excerpt from the trial court's opinion to assist our demonstration that the experts' conclusions accepted by the trial court were not mere conjectures or assumptions but were reasonable inferences based on valid evidence, and our verification that the trial court did not ignore but fully considered and reasonably evaluated the eyewitness testimony.
The trial court's opinion, as amended, in pertinent part, provides:
"These survival, wrongful death, personal injury and property damage actions came before this Court as a result of an accident which occurred on November 19, 1981, on Louisiana Highway 18 in Luling, Louisiana. The only remaining defendant is Louisiana Department of Transportation and Development (hereinafter referred to as "DOTD"). The facts adduced at trial are as follows: Andrew J. Touro Sr., owner and driver of a 1980 Dodge pickup truck, was travelling in an easterly direction on La. Hwy. 18 with Kenneth J. Wolfe as a guest passenger, whereupon he collided with a 1975 Ford gravel truck travelling in a westerly direction driven by Dwayne Alexander and owned by Henry C. Alexander. *594 The collision occurred in a curve-recurve section of La. Hwy. 18 upriver from its intersection with Barton Avenue. Kenneth J. Wolfe died at the scene of the accident; Andrew J. Touro, Sr., was taken to West Jefferson Hospital where he died on December 2, 1981; Dwayne Alexander was taken to St. Charles Hospital wherein he survived.
"Survival and wrongful death actions were subsequently brought by the widows and children of Kenneth Wolfe and Andrew Touro against the Louisiana DOTD. Personal injury and property damage actions were brought by Dwayne Alexander and Henry C. Alexander, respectively, against Louisiana DOTD. At trial, all plaintiffs sought to prove the negligence and/or strict liability of the Louisiana DOTD. Based on the testimony of lay and expert witnesses, and of the exhibits introduced into evidence, the Court finds that the Louisiana DOTD was both negligent and strictly liable for breaching its legal and statutory duty of maintaining safe highways and shoulders in order to protect those persons who may foreseeably be placed in danger by an unreasonably dangerous condition, such dangerous conditions causing the deaths of Kenneth Wolfe and Andrew Touro, the personal injuries of Dwayne Alexander, and the property damage to the gravel truck owned by Henry C. Alexander.
"Testimony of Joyce Hood, an eye-witness to the scene of the accident and a frequent traveler of La. Hyw. 18, established that (1) the road was wet from a previous rainfall; (2) the Touro pick-up truck appeared to have swerved in and out of its lane several times before impact with the Alexander gravel truck; (3) at the time of the accident, there was a 45 mph mandatory speed limit sign placed immediately before the first curve going downriver; (4) to Mrs. Hood's recollection, there were always low shoulders on River Road, especially near the Barton Avenue intersection; (5) from 1980-1982, Mrs. Hood never saw work done on the shoulders to improve the conditions, and that there were always holes on River Road; (6) on the date of the accident, there were no `Low Shoulders' signs on La. Hwy. 18 near Barton Avenue. Mrs. Hood couldn't recall if there was a 35 mph advisory speed limit sign posted at or near the first curve going downriver on the date of the accident.
"The testimony of Dwayne Alexander fairly corroborated that of Joyce Hood, with one additional fact: Alexander stated that he was travelling about 35 mph prior to the collision, but at the point of impact, was going approximately 25 mph.
"I. Robert Ehrlich, an expert in the field on accident reconstruction called by the plaintiffs, testified to the condition of La. Hwy. 18 based upon inspection made in June of 1984, on various photographs, and a videotape made approximately 6 weeks after the accident (P-96). In summary, Dr. Ehrlich concluded that: (1) the combined speeds of the Touro pick-up truck and the Alexander dump truck, were 70-80 mph; (2) ball-bank studies showed a 11-12½ degree deflection on the curves which is 2½ degrees above safety standards; (3) a motorist travelling at 45 mph upon entering these curves faces a possible hazard, especially if it has been raining; (4) the roadway surface is dangerous because asphalt has sunk below the stones, and the stones have worn to polished rock. Dr. Ehrlich opined that this roadway condition would not have changed significantly from 1981 to 1984 in light of the fact that it takes many years to polish the stones; (5) the total width of both lanes is 9 feetmost trucks are 8 feet wide. This causes other vehicles to veer off the road, into the shoulders; (6) holes in the road measured from 3-6 inches; (7) the greatest contributing factor to the accident in question was probably the slipperiness of the road due to the polished rocks on the roadway surface, together with the excessive mandatory speed limit of 45 mph.
"Duaine Evans, also an expert in the field of accident reconstruction and called by the plaintiffs, testified similarly to Dr. Ehrlich, and based his conclusion on his April 1984 inspection of the scene of the *595 accident, various photos, and the videotape made 6 weeks after the accident (P-96), but emphasized the existence of ruts along La. Hwy. 18 which he surmises were a probable cause of the accident. In addition, Mr. Evans concluded that the narrowness of the lanes causes motorists to veer off the road and end up in the ruts. In order to gain control, Mr. Evans testified that the driver must aim his tires at a greater angle, which generally causes the vehicle to cross the center line and enter into the other lane. Mr. Evans noted that had the mandatory speed limit been 35 mph instead of 45 mph, the accident probably would not have happened. Additionally, Mr. Evans stated that although posting certain warning signs is a temporary solution, the problem should ultimately be rectified by widening the lanes, filling the ruts, and posting a lower mandatory speed limit sign. Mr. Evans also stated that based on Joyce Hood's testimony, the stretch of La. Hwy. 18 in question was not a safe highway, A.J. Touro was not negligent with regard to the accident, and that lack of warning signs, low shoulders, and narrowness of the road were all the responsibility of DOTD, according to Louisiana Manual on Uniform Traffic Control Devices (P-23, et. seq.).
"The testimony of John Niklaus, a professor of civil engineering with expertise in the area of traffic control and engineering and called by the plaintiffs, substantiated Dr. Ehrlich's and Mr. Evans' testimony. Professor Niklaus concluded that 45 mph as a mandatory speed is not safe, and that the low shoulders on the highway cause drivers to lose control.
"It should be noted that all the above experts were shown P-96, the videotape of La. Hwy. 18 taken 6 weeks after the accident. Moreover, Joyce Hood, after viewing the tape, stated that the scenes photographed accurately depicted the scene of the accident. The videotape shows no advisory speed limit sign of 35 mph anywhere before, during, or after the curves located near Barton Avenue. It does, however, show ruts and low shoulders along the road, with no warning signs in appropriate places (which should be 750 ft. from the hazard in question, according to the Manual on Uniform Traffic Control Devices, P-23, et seq.). Therefore, based on the videotape, which this Court presumes is a fair and accurate depiction of the stretch of La. Hwy. 18 where the accident occurred at the time of its occurrence, Dr. Ehrlich, Duaine Evans, and Professor Niklaus concluded that the conditions which were present upon their inspection of the Highway in 1984 were most probably the same in 1981.
"In order to refute the testimony of the plaintiff's expert witnesses, defendant DOTD called Dr. Ned Walton, an expert in the field of highway designs and traffic engineering. Dr. Walton based the following conclusions on a visual inspection of La. Hwy. 18 in June of 1984 and admittedly did not perform a ball-bank test, a shoulder test, a curve test, or a curve-recurve test. Dr. Walton also did not traverse La. Hwy. 18 at 45 mph, the posted mandatory speed as declared by a 1977 executive order (P-43). Thus, Dr. Walton's conclusions were as follows: (1) the friction quotient of the road surface was within normal limits; (2) the edge formed between the roadway surface and the shoulders of the road did not have a vertical face; therefore, it would not have caused the Touro truck to lose control; (3) the road itself did not meet the standards of the Blue Book, but Dr. Walton stated that this failure does not mean the road was unsafe. In summation, Dr. Walton concluded that he found no road or traffic condition which would have caused the accident.
"The DOTD also called Trooper First Class Johnnel Temple as a witness to corroborate the findings of Dr. Ned Walton. Trooper Temple was the investigating officer to the November 19, 1981 accident. The crux of Temple's testimony is that he found no ruts in the roadway, no low shoulders in the curves, no gouge marks in the entire "S" curve, and that had the road looked like the road depicted in the photo he was shown at trial, he would have noted it as important information. Trooper Temple admittedly did not measure the difference *596 between the surface of the road and the surface of the shoulder. It was brought out that the extent of Temple's training in accident investigation and reconstruction consisted of instruction for eight hours a day for four months. During the course of Trooper Temple's examination, information was elicited that the last overlay performed on La. Hwy. 18 was on July 8, 1966. On direct examination, Temple testified that the speed limit in effect was 35 mph, and that he remained on assignment in this area for approximately 4-6 weeks after the accident. On cross-examination, Temple admitted that the area in question remained the same after the accident as when the accident occurred. However, the videotape made 6 weeks after the accident (p-96) shows the posted speed limit as 45 mph. Thus, this Court must evaluate Temple's memory of three years ago, and compare it to a video tape which has preserved the area in question from 6 weeks after the accident until the present time. A review of still photographs made of the videotape show 45 mph as the posted speed limit, shoulders which appear to the naked eye as being at least 3 inches below the surface of the roadway, large ruts and crevices consistently throughout the roadway surface, and the absence of an advisory speed limit sign of 35 mph. It is also important to note that some admissions were made by Trooper Temple in his deposition which was used to impeach Temple's testimony. To paraphrase, Trooper Temple stated that he could tell some horrifying stories about La. Hwy. 18, specifically the curves where the accident in question took place. Furthermore, he admitted that when travelling that area, he gets a false sense of security, even if driving less than the speed limit.
"This Court also takes cognizance of the fact that various witnesses were subpoenaed by the DOTD but were never called to testify; thus, the presumption that their testimony would be adverse to the DOTD's defense was properly invoked.
"Overall, this Court finds that the expert opinions and supporting factual evidence offered by the plaintiffs was more credible than that offered by the defendant. The plaintiffs submitted a multi-based theory, well supported by their evidence. The defendant offered no real postulate as to why this accident happened other than to propose that Touro lost control of his vehicle. Why he lost control is the essential issue of this case. The plaintiffs dominated in their reasonable answers offered as to that issue.

* * * * * *
"It is the opinion of this Court that the testimony of the plaintiffs' expert and fact witnesses satisfy this element of proof in that they all opined that the shoulders posed a hazard to motorists travelling La. Hwy. 18. This Court finds that the highway and its adjoining shoulder were a vice or defect that occasioned an unreasonable risk of injury or harm. In addition, this Court finds other conditions of the roads which constituted a vice or defect, namely, the sharp degree of the curve-recurve at 45 mph, the slickness of the road surface caused by a wearing down of the stones, inadequate warning signs, and the narrowness of the road at the curve-recurve sector. Thus, this Court is of the opinion that the above defects collectively posed an extremely unreasonable risk of harm to motorists.

* * * * * *
"This Court concludes that based on the testimony of plaintiffs' expert and fact witnesses, the accident in question, which ultimately led to the deaths of two individuals, would not have occurred had the deplorable condition of La. Hwy. 18 not existed.
"Thus all elements of strict liability under C.C. 2317 having been proven by the plaintiffs, the DOTD, as custodian of La. Hwy. 18, can escape liability only by showing that the harm was caused by the fault of the victim, by the fault of the third person, or by an irresistible force. Loescher v. Parr [324 So.2d 441 (La.1975)], supra. This Court finds that the DOTD failed to prove by a preponderance of the evidence any of the aforementioned defenses. All accident reconstruction experts, *597 with the exception of Dr. Walton, concluded that Andrew Touro was more probably than not travelling within the designated 45 mph speed limit. Assuming arguendo that Touro was driving in excess of 45 mph, the accident in question would likely have occurred irrespective of his speed. See Stephens v. State, through the Department of Transportation and Development, 440 So.3d [2d] 920 (La.App. 2d Cir. 1983). Furthermore, the DOTD cannot claim that since Touro was a frequent traveler of La. Hwy. 18, he assumed the risk of being harmed from the defective conditions of the road. Additionally, DOTD failed to prove the fault of Dwayne Alexander as a defense to claims of the widows and children of Wolfe and Touro. In summary, this Court finds that the plaintiffs satisfactorily proved all elements of strict liability of the DOTD pursuant to LSA-C.C. Article 2317.

* * * * * *
"Under a theory of negligence, the DOTD will be held liable when the evidence shows the condition complained of (1) was patent or obviously presented an unreasonable risk to prudent drivers, (2) the DOTD had actual or constructive notice of the defect, and (3) the DOTD failed to correct the defect within a reasonable time. Chiasson v. Whitney, 427 So.2d 470 (La.App. 5th Cir.1983); Usry v. Louisiana Department of Highways, 402 So.2d 240 (La.App. 4th Cir.1981); U.S.F. & G. Co. v. State Department of Highways, 339 So.2d 780 (La.1976). Thus, this court must carefully examine the facts in the present case to determine whether a legal duty should be imposed upon the DOTD which protects against the particular risk involved. LeBlanc v. State, Louisiana Department of Highways, 405 So.2d 635 (La.App. 3rd Cir. 1982 [1981]), reversed on other grounds 419 So.2d 853 [1982].
"Plaintiffs have proven that La. Hwy. 18 posed an unreasonable risk to motorists by introducing evidence of the hazardous nature of La. Hwy. 18, via testimony of lay and expert witnesses and the deposition of Trooper Temple, pp. 41, 42. They also proved that the last asphalt overlay was made in 1966 (P-16). As of that date, no work on the shoulders of the road has been performed to bring them level with the surface of the road. This is evidenced by the testimony of Joyce Hood and Dwayne Alexander. It was also established that no warning signs were present prior to the curve to warn motorists of the disparate levels. Thus, plaintiffs have sufficiently proven that the condition of La. Hwy. 18 constituted a defect which caused an unreasonable risk of injury to drivers travelling that highway.
"With regard to the element of `actual or constructive' notice, the third circuit in LeBlanc, 405 So.2d at 637 stated that where `a four to six inch dropoff was easily observable (and in fact was observed by several motorists who testified during trial),... the Department, if it did not know, should have known of this dangerous shoulder condition, thus satisfying the notice requirement.' This Court finds that plaintiffs proved constructive knowledge of the DOTD by the fact that the level differential between the road and its shoulder was readily observable and that its duty to periodically inspect the highways in their custody was obviously breached, evidenced by the absence of work done on the shoulders, ruts, etc. Therefore, constructive knowledge of the poor condition(s) of La. Hwy. 18 is imposed on the DOTD.
"This Court also concludes that the DOTD failed to take corrective action within a reasonable time. The fact that the last overlay was made in 1966, that no measures were taken to level the shoulders with the road, and considering the number of accidents which have occurred on the curve-recurve section of La. Hwy. 18 all constitute a failure to correct the defect(s) of that highway. Thus, liability under negligence may attach."
From our review of the evidence we conclude that the trial court made reasonable findings of fact from all of the evidence, that the inferences of experts relied upon in part by the trial court were reasonably based on valid evidence, and that the trial *598 court properly applied the correct legal precepts to the facts it found and reached a just result. We will discuss in detail, however, only the limited aspects of the trial court decision assailed by relator.

1. The experts' inferences were reasonably based on valid evidence
The experts' opinions were not inferences from defective or presumptive evidence or facts taken for granted, as asserted by relator. The experts' inferences were reasonably based on valid evidence.
The three expert witnesses called by the plaintiffs, Dr. I. Robert Ehrlich, a mechanical engineer and professor of mechanical engineering at Stevens Institute of Technology, Dwayne Evans, an accident reconstruction expert, and John Niklaus, civil engineer, traffic control engineer, and professor of engineering at Tulane University each independently testified that one or more defective conditions of the highway caused the Touro vehicle to go out of control. Essentially, the rationale of these experts was as follows: The maximum safe speed for the curve under dry, normal conditions was 35 m.p.h. due to its sharpness, its lack of banking and its low traction supply. Just prior to the accident Touro was driving downriver along a wet highway toward the curve, with which he was unfamiliar, at 45 m.p.h. The posted speed limit for Hwy 18 was 45 m.p.h. and no other sign was placed ahead of the curve. The roadway in the curve was very narrow, the curve was deceptively sharp, the road's asphalt surface was badly worn down below its smoothly polished stone compositionmaking the road very slippery when wet, the roadway was wet from a recent rain, and the road shoulder running through a recreation center's shell parking lot contained ruts and drop-offs. As Touro's vehicle was rounding the curve near the parking lot it lost traction and began fishtailing or swerving from one side of the road to the other, ultimately colliding with Alexander's truck. The failure of the DOTD to resurface the highway, straighten or bank the dangerous curve or to post a sign reducing the speed limit to 35 m.p.h., and to repair or post a sign warning of the defective shoulder, rendered the highway defective or unreasonably dangerousespecially when wet. Because there was no direct evidence that Touro was guilty of any negligence causing his vehicle to lose traction, it is more probable than not that the accident was caused by one or more of the highway defects described above.
That 35 m.p.h. was the maximum safe speed for the curve under normal conditions was derived by the experts from the results of three independent ball bank tests performed by the state of Louisiana, Evans and Niklaus, as well as from personal inspections and test drives through the curve at various speeds. The ball-bank indicator is widely used by highway departments, research groups and local agencies as a uniform measure to determine safe speeds for highway curves. This device consists of a glass tube, with its ends curved upwards, containing clear liquid and a ball; the ball is free to move up the tube in response to centrifugal force as a vehicle rounds a curve. With such a device mounted in a vehicle rounding a curve, the ballbank reading indicates whether the combined effect of speed, centrifugal force and traction loss is unsafe. The three experts called by the plaintiffs, interpreting the three independent ball bank tests on the curve (one of which was performed by the state) testified that the maximum safe speed was 35 m.p.h. Their opinions were also informed and bolstered by their observations and test drivings of the curve.
The state's safety expert testified that 45 m.p.h. was a safe speed for the curve. He did not drive through the curve or perform any ball-bank indicator tests; however, his conclusion was based on radar tests which he said showed that 85% of traffic on the curve travelled through it at 45 m.p.h., his visual observation of the road, and mathematical computations based on standard estimated friction coefficients from a manual giving such data for various types of road surfaces. In his opinion the ball-bank test results merely indicated comfortable curve speed, not safe curve speed.
*599 Nevertheless, even the state's expert testified that the ball-bank indicator is widely used by state and local governments and researchers to establish safe curve speeds, not just comfortable speed limits. The time, conditions, and quantity of the radar sample used by the state's expert were not given. Without more underlying data the radar speed survey is not highly persuasive as to the safe speed limit for the curve at the time and under the conditions of a particular accident. For these reasons and because the relator's expert performed no driving or ball-bank tests, we conclude that the trial court was justified in rejecting his opinion and in finding more persuasive the opinions of the plaintiff's experts.
The conclusion that Touro's truck was travelling about 45 m.p.h. when it entered the curve was reasonably inferred from the following evidence: Three ball-bank tests performed independently by the state, Evans and Niklaus, as well as the inspections and test drives by plaintiff's experts, indicated that the maximum safe speed for the curve was 35 m.p.h. The damage to the vehicles indicated that their combined speed upon impact was 70-80 m.p.h. Alexander testified on two different occasions that he was travelling 25 and 35 m.p.h. just prior to the collision. Deducting Alexander's speed of 25-35 m.p.h. from the estimated combined speed of 70-80 m.p.h., would indicate that Touro's vehicle was travelling somewhere in the range of 35-55 m.p.h. at the moment of impact. Joyce McDonald Hood, an eyewitness, testified that Touro's pickup did not appear to be coming around the curve too fast and did not appear to be going as fast as 55 m.p.h. Dr. Erlich testified that Touro's vehicle would have gone completely off the road if he had been going over 45 m.p.h.
The wetness of the roadway was established by the testimony of Trooper Temple, Mrs. Hood and Mr. Alexander.
That the DOTD had not posted any signs reducing the 45 m.p.h. speed limit for the curve, that the road shoulder running through the parking lot was defective, and that there were no warnings of the dangerous curve or shoulders posted, were reasonably inferred from the eyewitnesses' testimony and a video tape of the scene introduced into evidence. The video tape, made six weeks after the accident, showed a 45 m.p.h. speed limit sign for downriver traffic posted just ahead of the curve. The same video tape also reflected that the highway's asphalt was worn below its polished stones, the shoulders were lower than the roadway, the shoulders contained ruts, and no signs were posted warning of these conditions. Mrs. Hood testified that she could not remember seeing warning signs that day, but that when she travelled the same area two days later there were no signs. Mr. Alexander testified that he had seen only a "Low Shoulder" sign for upriver traffic on the day of the accident.
This evidence was controverted by Trooper Temple who testified on direct examination that the curve was posted with a 35 m.p.h. sign of some kind and there were no ruts or drop-offs within 300 feet of the point of impact. The experts and the trial court reasonably could have disregarded Trooper Temple's recollection as incorrect for several reasons. First, the road and shoulder conditions reflected by the video tape obviously could not have developed within a mere six weeks after the accident. Second, the DOTD did not come forward with any evidence from its records or by its employees to show that the speed limit sign had been changed between the accident and the video taping. Third, Temple wavered on cross-examination and admitted that he did not measure for a drop off in the area of the parking lot, that the shoulder there could have been as much as six inches below the roadway. Fourth, Temple ultimately conceded on cross-examination that he knew nothing about the parking lot. Finally, Temple contradicted himself twice about the location of caution signs he had observed in the vicinity on the day of the accident.

2. The trial court did not disregard but fully considered and reasonably evaluated the eyewitness testimony.
There were only two eyewitnesses to the accident, Mrs. Hood and Mr. Alexander. *600 As evidenced by the trial court's reasons for judgment, full credit was given to their testimony. Mrs. Hood testified that the road was wet, that she observed the pickup truck swerve or fishtail twice, that she did not notice any curve warning or reduced speed signs, and that the road had had a low shoulder for about fourteen years. Mr. Alexander testified to essentially the same facts, but added that he did not notice the shoulder of the road that day. Rather than being disregarded by the trial court, these facts formed part of its reasons for judgment and provided the basis for reasonable inferences by both the trial court and the experts.
Relator in its brief mistakenly assumes that Trooper Temple was an eyewitness to the accident. He was not because he arrived approximately thirteen minutes after the collision had occurred. In any event, the trial court did not disregard or unreasonably reject his testimony. The trial court, which saw and heard Trooper Temple testify, fully considered and discussed his testimony in its reasons for judgment. As noted in the trial court's reasons and in this opinion, there were ample reasonable grounds to doubt the accuracy of his recollections as to speed limit signs and shoulder conditions and to find the eyewitnesses' testimony and video tape evidence more persuasive on these points.

CONCLUSION
Generally, from our review of the evidence we conclude that the court's findings of fact were reasonably based on all of the evidence and that it responsibly applied the correct legal precepts to the facts found; and that the court of appeal correctly upheld the trial court judgment.
Specifically, for the reasons assigned, relator's claim that the trial court erred by basing its decision on experts' conjectures and by disregarding eyewitnesses' testimony is without merit.
Accordingly, we affirm the judgments of the previous courts.
AFFIRMED.
LEMMON, J., concurs and assigns reasons.
MARCUS, J., dissents and assigns reasons.
LEMMON, Justice, concurring.
Plaintiffs failed to prove that defects in the shoulder of the road had any causal relationship to this accident. Nevertheless, the record adequately supports the trial judge's conclusions that traversing the curve on the wet highway was unsafe at the posted speed limit of 45 miles per hour and that DOTD failed to post signs warning motorists to traverse the curve at a lower speed.
MARCUS, Justice (dissenting).
I consider that the trial judge was clearly wrong in finding that the alleged highway defects caused the accident in question. The evidence was too speculative to reach this conclusion. I consider it more likely that the accident was caused by Touro losing control of his vehicle while attempting to negotiate the curve too fast on a wet highway. Accordingly, judgment should not have been rendered against DOTD. I respectfully dissent.